ELLIS, Judge.
Plaintiff filed this suit for damages for personal injuries allegedly as the result of an accident on Feb. 8, 1954 which occurred while he was working for H. E. Wiese, Inc. when he was struck by a truck driven by defendant Ralph E. Clark and owned by his employer, also a defendant, Esso Standard Oil Company, and which was insured by the defendant Indemnity Insurance Company of North America.
Plaintiff alleges that as a result of the accident he sustained serious injuries to his back in the region of the left flank, great pain “up to on or about the latter part of August, 1954; and since such time to a lesser extent, and especially since then petitioner has suffered recurrent episodes of great pain in his back, though with some periods of lesser pain or relative comfort.”'
Plaintiff is also seeking lost wages from the date of the accident, Feb. 8, 1954, to on or about August 27, 1954, or a total of $1,-450. He is further seeking $25,000 for pain and disability “in the past and the certain partial disability in the future;” for pain and suffering he is asking the sum of $15,.-000, and an additional sum of $10,000: because of said injuries, also medical expenses to the date suit was filed of $250' and further medical expenses which it is alleged will exceed $2,500. Altogether, plaintiff is seeking $54,200 damages.
The case was duly tried and judgment originally rendered in favor of the plaintiff *460 for pain, suffering and partial disability in the amount of $7,500, and medical expenses in the sum of $326.65, as well as $1,450 for loss of wages less $225 which the plaintiff drew in unemployment securities. In addition, judgment was rendered in favor of the intervenor compensation insurer for $1,078.58 representing medical payments and workmens compensation paid to plaintiff by intervenor, plus an additional $150 for attorney fees for counsel for inter-venor.
Counsel for defendants filed a written motion for new trial, one of the grounds being an allegation that since the completion of the trial the plaintiff had been working practically continuously doing heavy, hard manual labor, and that his activities since the trial as shown by his work record thereafter were completely inconsistent with his claims that he could not do any heavy lifting or stay in a stooped or squatted position for any length of time, and inconsistent with his claim that when he attempted to lift heavy objects or stoop or squat for any length of time he suffered great pain. Defendants annexed to this motion four photographs showing the plaintiff digging what looks to be a ditch in connection with the construction of a building, and also annexed affidavits to substantiate the allegations of their motion.
A hearing was had and a new trial granted and additional evidence heard by the lower court after which the principal award originally decreed to the plaintiff in the sum of $9,051.65 was reduced to the sum of $5,301.65. The entire reduction was in the award of $7,500 for personal injuries to the plaintiff. The amount finally awarded 'for personal injuries to the plaintiff was $3,750, this being the only reduction in the original judgment.
Defendants have appealed from this judgment and counsel for plaintiff has answered the appeal asking for an increase in the award to the original amount prayed for, and has also filed a motion to remand the case to the District Court “for hearing of evidence on whether or not the physical condition of plaintiff-appellee has so developed since the trial below that a spinal fusion should now be carried out at the site of plaintiff-appellee’s said injury.” Defendants have filed opposition to the motion to remand and alternatively object for the reason that the evidence would be merely additional and cumulative to that already submitted which composes part of the record herein. Further, that the plaintiff-ap-pellee had been in the possession of the information which he now alleges should be offered in evidence in this cause since approximately February 7, 1956, and having filed answer to the appeal herein, it constitutes acquiescence in the record in the case as completed and plaintiff-appellee “is now estopped to move for a remand of the case * * * In view of the conclusion which we have reached in this case that plaintiff’s partial disability as the result of the accident had ceased subsequent to the rendition of the original judgment the motion to remand is hereby refused.
The first question presented on this appeal is the liability of the defendant Clark, which depends upon, first, whether he was negligent; second, whether plaintiff was contributorily negligent so as to bar his recovery and, third, even if plaintiff was con-tributorily negligent, the applicability of the doctrine of last clear chance.
This accident occurred within the confines of the plant of Esso Standard Oil, north of Baton Rouge, on an asphalt street designated as Fifteenth Street, which, according to the testimony and pictures was approximately eighteen to twenty feet wide, with a strip of ground between the asphalt and the adjoining buildings covered apparently in some places with shell, gravel or just dirt. This street, referred to by counsel for plaintiff as a passageway, either designation being immaterial to a decision in the case, runs east and west, and at about 1 o’clock on February 8, 1954, the plaintiff came from the north side of the street with a box of trash which he intended to place in a large trash bin which was sitting on the opposite side of the street within about two feet of the asphalt. Plaintiff crossed the street in a southeast *461 erly direction, and when he got within arms length of the trash bin, he threw the box of trash in this large bin. The truck came from the west, traveling toward the east in the south or right hand lane. The plaintiff was struck, according to the testimony, just as he started to turn to his left away from the bin, which would put him very close to the edge of the asphalt, or he was struck after he had turned and gotten about three feet away from the edge of the asphalt or had backed into the street two to four feet in order to turn and recross this street. The testimony on this point is rather long and involved and voluminous, but we believe that this is a fair summation of the place the plaintiff was in with reference to the edge of the asphalt street at the time he was struck according to the various witnesses.
The trial judge specifically commented upon the defendant Clark’s testimony and cited conflicts therein and finally concluded:
“Except as to the location as to where Hudson fell * practically all Clark’s testimony is in sharp conflict with the great preponderance of evidence given by some dozen other witnesses who had no interest whatever in the outcome of the case.”
Counsel for the defendant in his brief admits that Clark made a number of conflicting statements in his testimony and in his pre-trial depositions but states that they believe he was only confused and was not deliberately attempting to be uncooperative or evasive.
Clark’s testimony is rather difficult to reconcile for he does state in his depositions that he saw the plaintiff on the side of the road, and then further on he states in his testimony that he saw him standing in the middle of the road, but a consideration of all his testimony leads us to believe that when he stated he saw plaintiff on the side of the road, he was really referring to the middle of the street, for he testified very distinctly and plainly that he intended to pass in front of the plaintiff. In order to do this, it is necessary that we accept his meaning to be that the plaintiff was standing in the middle of the road and that he was going to pass on the right hand side in the south bound lane, but that when he got close to the plaintiff the latter walked out in front of his truck; that he swerved to the left and applied his brakes but could not avoid the accident. As found by the trial judge, we cannot accept this version in the face of the preponderation of the testimony to the contrary, however, defendant Clark could not escape liability nor would the contributory negligence of the plaintiff bar his recovery, for Clark had the last clear chance under this testimony to avoid the accident. It is conceded by all the witnesses, including the defendant Clark that the plaintiff fell at the south edge of the pavement right by the large trash bin which was approximately two feet from the edge, and, further, that the plaintiff was struck on the right side, either the hip or in the back according to the various witnesses, and according to the testimony of Clark as well as of other witnesses, the plaintiff was facing away from the truck at the time he was struck, in other words, had his back toward the truck. The distance plaintiff evidently had to walk as he came from the middle of the road to the point where he was struck was at least some six to nine feet, and the defendant Clark was estimated to be traveling any where from 15 to 20 miles per hour, which would have placed him a sufficient distance, if he had been keeping a proper lookout, to have noted the perilous position of the plaintiff in sufficient time to have either stopped his truck, which the evidence shows he did actually do within approximately 12 feet of the point of the collision, or to have gone to his left around the plaintiff and completely missed him. As stated, however, the preponderance of the testimony completely destroys the defendant’s contention that the plaintiff was in the middle of *462 the road and walked from the middle across in front of him toward the trash bin, as does defendant Clark’s own testimony that the plaintiff had his hack toward the truck and never did see it and was struck either in the right hip or on the right side of his back. The defendant Clark never testified or intimated in his testimony that he ever saw the plaintiff in any other position or at any other time than stopped in the middle of the street and walking across the street just as he alleged, which is most convincing that Clark never did see the plaintiff. Clark was, therefore, negligent in not keeping a proper lookout and seeing what he should have seen, and the plaintiff was contributorily negligent provided we accept his statement taken by an adjuster that he had thrown the trash into the bin and turned to walk across the street and was approximately 3 feet in the street, or that he backed into the street one or two steps or a distance of two to four feet, for it is admitted that he never did look. Of course, if the plaintiff was struck before he had changed his position any distance, as he testified and as he contended throughout the trial, his failure to look and his position on the edge of the asphalt opposite the trash bin would not be a contributing or proximate cause of his being struck. However, even if we accept the testimony that he did step three feet into the street, which is possible but not logical in view of the fact that he fell right at the edge of the asphalt, the defendant Clark, taking his speed of 10, 15 or 20 miles per hour, had a sufficient warning, had he been looking, of the perilous position of the plaintiff that he could have avoided the accident by stopping or turning to his left. The asphalt part of the street was estimated to be from 18 to 20 feet wide, and there is no testimony that the plaintiff was in any hurry.
After a careful consideration of the entire testimony we believe that plaintiff was struck very close to the right edge of this asphalt near the trash bin, and that the defendant Clark never did see the plaintiff until almost the moment of the collision. There is some testimony that he skidded approximately 5 feet, according to the black marks, before striking the plaintiff, and then an additional 10 or 15 feet before stopping. Had defendant Clark been keeping a proper lookout, the accident would not have occurred, for if the plaintiff was standing still or practically in the same spot on the edge of the asphalt as that from which he threw the trash into the bin, there was no excuse for the defendant to strike him, and if the defendant had seen the movements of the plaintiff, which he should have, and plaintiff did step two to four feet into the road, Clark had sufficient time in which to effectively act.
We believe that the lower court correctly applied the principle of law in the case of Cox v. Groce, decided by this Court in 47 So.2d 102. We do not believe from a judicial standpoint that the cases relied upon by the defendant and cited in his brief, viz.: Finlay v. Standard Accident Insurance Co., La.App., 19 So.2d 302; Montgomery v. Louisiana Power & Light Co., La.App., 84 So.2d 268, and Silvera v. Gallardo, La.App., 63 So.2d 15, are applicable to the case under consideration.
As to the question of disability, counsel for plaintiff in his brief has concisely set forth his position as follows:
“The basis of plaintiff’s claim here is that he had a congenitally defective back prior to the truck hitting him. That prior to the truck hitting him, plaintiff had never had any difficulty with his back, as indicated by his service in the American Army as a combat infantryman in World War II in the New Guinea, Northern Solomons, and Southern Philippines campaigns. In addition, the records show that the plaintiff had worked as a common laborer in the Baton Rouge vicinity for numerous contractors prior to being hurt and at no time had ever complained of having a back ache. The plaintiff’s further position is that since his injury on February 8, 1954, he has suffered pain from the activation and aggravation of his congenitally defective. hack, whereas he had never had *463 any pain from such defective back pri- or to the activation thereof by the truck hitting him on February 8th, 1954.”
There is no evidence of any complaint of disability on the part of the plaintiff prior to his injury on Feb. 8, 1954, although he had served in the Army as stated above in his brief, and as a common laborer, and the record clearly shows that the congenitally defective condition of his back was in no wise disturbed, injured or changed as a result of the accident for all the x-rays as testified to by the radiologists show no change in the congenitally defective condition of his back, and, in fact, these doctors could find nothing on the x-rays which would verify the source of the plaintiff’s complaints, in other words, there was nothing objective as shown by the x-rays themselves.
The reasons given by the District Court as to the medical testimony on the question of disability are borne out by the record and we quote them in part as follows:
“On the day of the accident plaintiff was sent to Dr. John C. Stovall, the company’s physician. From that time up to the date of the trial five of the most prominent and leading doctors of Baton Rouge have either treated or examined this plaintiff, or both. Dr. Stovall and Dr. Pickell are general practitioners. Dr. Stander and Dr. McMains specialize in orthopedics. Dr. McVea specializes in general and traumatic surgery. Dr. Stovall saw this plaintiff almost every day until February 18, 1954, when he felt that he should be able to go back to work and discharged him. On the day of the accident Dr. Stovall had x-rays made of the plaintiff’s back and the report showed that the plaintiff had a congenital defect or abnormality involving the interarticular processes of the fifty or last lumbar vertebra. Dr. Stovall saw those pictures before he discharged the plaintiff, but said that at the time the plaintiff was discharged he still complained of pain in the back but the doctor thought the plaintiff would benefit by going to work. The doctor thought the congenital defect was of no importance in connection with this injury at that time. The doctor testified that it was his opinion that the congenital condition caused the back to be injured more easily and if he were to examine him today and find muscle spasm and basis for the .plaintiff’s complaint it would be his opinion that the accident aggravated the defect in the back.
“Dr. Pickell saw the plaintiff several times up until he finally discharged him as able to go back to work about April 24, 1954. He stated that as far as he could tell at that time he should be able to resume regular work, but he has seen the plaintiff twice since then and found that the plaintiff was still having trouble with his back. The last time this doctor saw him was on October 8, 1954. Dr. Pickell states that the plaintiff was complaining of pain and he detected muscle spasm in his back during the period of his examinations and treatment.
“I find no necessity of analyzing each physician’s testimony separately for the reason that Dr. Stander, Dr. McMains and Dr. McVea all agree in substance that apparently this plaintiff’s accident in February initiated the symptoms referrable to his back and aggravated the abnormal condition which existed from the time of plaintiff’s birth. They all agree that it may have been possible for this plaintiff to have gone through life, leading an ordinary life of a laborer, without ever knowing of his congenital abnormality; that attention must be paid to plaintiff’s complaints particularly in view of the fact that they discovered tenderness and some basis for the complaints. They all agree that it is entirely possible that this traumatic injury on February 8th put in motion the trouble which Hudson still has with his back.
*464 “To copy all of the testimony of these five outstanding doctors and the two x-ray specialists would present an imposing and voluminous symposium of medical lore and expert opinions in full agreement as to the effects of this accident on this plaintiff. A fair epitome or gist of the medical testimony would he these statements:
“By Dr. McMains at page 109 of the transcript:
“ ‘A. * * * It is my impression that this patient has a congenital spondylolysis without any slipping of the vertebral body. Apparently the patient’s accident in February initiated his symptoms referrable to his back and have aggravated this condition. It would be anticipated that the natural course of this process would be recurrent episodes of pain in his back with some periods of relative comfort. With a back brace this patient probably could be kept symptom free and carry on activities which do not require heavy lifting or stooping.’
“and at page 113:
“ ‘A. People with this * * * it is my experience people with this defect that start having symptoms or attempting to do heavy manual labor they will continue to have pain and an increasing amount of pain with the advancing of age and with the increased activity.’
“and at page 114:
“ ‘Q. Now, Doctor, if this man continued labor work as he was accustomed to doing and wears this back brace, do you think that he will be a one hundred per cent able and capable to carry on his business without pain? A. No, sir, I believe if he goes back to heavy manual labor he is going to have to continue to have back pain.’
“and at page 115:
“‘Q. Now, would you anticipate that as you say in your letter that he would have recurrent episodes of this pain for the rest of his life? A. I think it is * * * Yes, sir.’
“and by Dr. McVea at page 300:
“ ‘Q. Is it possible that the cartilage or fibrous tissues that you spoke of that were holding the juncture of this Lumbar-Five on the sacrum was disturbed by this truck hitting this boy in his back and knocking him so that he was thrown over the fender. A. That could have been.
“Q. It could have been disturbed? A. Yes, sir.’
“And the statement by Dr. Stander at page 369:
“ ‘A. Yes, I think the trauma could be a contributing factor to his congenital condition becoming symptomatic.’
“and at page 360:
“ ‘Q. Just to clarify the situation, trauma is always a factor, added trauma, and when I saw this young man the last time, he had no positive symptoms, no residuals. If he had been under my care I would have discharged him as being cured, but still there was that possibility that the trauma had done something to this area that I cannot be sure of either way. I would just like the court to know that I just can’t be arbitrary one way or the other about it. I don’t think anyone can.’
******
“ * * * But this is a tort claim and we cannot say that the plaintiff cannot work because he has worked for quite some time though he contends that he suffers severe pain in doing so. He registered with his union and the employment office as being able and willing to work and he did work. The doctors all say that he should not do heavy manual labor, but with the support of a brace he would *465 probably be able to get along all right if he confined his work to light duty.
“The evidence here leavs no doubt that plaintiff up to February 8, 1954 had done various kinds of common heavy labor without any pain and without any knowledge that he was born with a back deformity. In addition he served as a foot soldier for several years in arduous training and in active combat on foreign lands during World War Two, all without any back trouble.”
Based on the above finding as to disability, the Lower Court awarded the sum of $7,500 to cover damages for pain, suffering and partial disability “which could last the remainder of his life.” Upon rehearing, this award was reduced to $3,750. No written reasons were given and we can only surmise that possibly the District Judge, after seeing the pictures of the plaintiff doing arduous, manual labor, and hearing the testimony of witnesses, including fellow employees and employers, to the effect that he did his work as well as any one else and without any apparent pain or complaint of, pain, decided that plaintiff’s disability was not as great as he thought from the testimony adduced on the original trial of the case. The medical testimony preponderated to the effect that the plaintiff had suffered a back strain and, as found by the District Judge, as a result of this back strain that the congenitally abnormal condition of the plaintiff’s back in effect prevented a complete cure, and that plaintiff would always suffer pain if he performed heavy, manual labor. It was also admitted by most of the medical men that if he had never had an accident, the mere performance of heavy manual labor may have brought on the same condition due to the congenitally abnormality of plaintiff’s back, but in view of the fact that he had never suffered with his back prior to the accident, it was their opinion that the pain which he complained of was brought about by the accident which, in effect, brought about plaintiff’s back strain and injury. Therefore, the District Court reasoned on the first trial that he was partially disabled, possibly for the remainder of his life, from doing hard manual labor. On the new trial the testimony preponderates to the effect that plaintiff did arduous, manual labor without any complaint of pain and in a most satisfactory manner to his employers. He still contended that his back hurt him at night and that he worked in pain, however, the District Judge evidently concluded that he was no longer disabled to perform heavy manual labor and reduced the award accordingly.
In the face of the positive testimony and the pictures introduced in evidence that the plaintiff was performing the hardest kind of manual labor subsequent to the original trial and judgment, the medical testimony as to subjective findings is not very convincing. It is most illogical to conclude in the face of the positive testimony that the plaintiff was suffering any disabling pain when he was performing the heavy manual labor definitely performed as shown on the new trial, or that he suffered such excruciating pain at night. There is absolutely no evidence other than his own testimony that he suffered pain while working and at night after working hours.
Considering the entire record, there is no manifest error shown in the’ lower court’s reduction of the original award for personal injuries, suffering and partial disability, and the judgment is accordingly affirmed.

 This witness testified that after the collision Hudson fell at the south edge of the pavement right by the large trash bin.